**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| PAMELA MACKNET | CIVIL ACTION |
| v. | NO. 15-5321 |
| UNIVERSITY OF PENNSYLVANIA | |

Baylson, J.                                                    September 14, 2017

## MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In this age discrimination case, Plaintiff Pamela Macknet alleges that Defendant the Trustees of the University of Pennsylvania retaliated against her in violation of the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA"). Defendant moves for summary judgment on all three claims. For the reasons outlined below, we agree with Defendant that Macknet has failed to show a genuine issue of material fact as to any claim and that summary judgment is warranted.

### I.    Facts

The following facts are taken from Defendant's Statement of Facts and are undisputed by Macknet. Macknet began working for Defendant on May 9, 2005, when she was hired as an Administrative Assistant at Defendant's Perelman Center for Advanced Medicine. (ECF 31, Def.'s Mot., Def.'s Statement of Facts ("DSOF") ¶ 17.) Throughout her tenure in Defendant's employ, Macknet worked in the Hematology/Oncology ("Hem/Onc") Department, supporting different doctors at various times. (Id., DSOF ¶ 18.) Macknet initially supported Dr. Susan Domcheck and continued to do so until sometime after 2010. (Id., DSOF ¶¶ 19, 21, Ex. B (Dep. Tr. of Macknet at 44.) Macknet had significant issues completing her work in a timely fashion for Dr. Domcheck, and received negative feedback from the doctor on several occasions. (Id.,

DSOF ¶ 20, Ex. B at Macknet-5.)  At the time of Macknet's termination, she was supporting Drs.

Bruce Giantonio and Charu Aggarwal.  (Id., DSOF ¶ 22.)  As a result of deficiencies in

Macknet's patient care and administrative tasks, particularly concerning the work she performed

for Dr. Aggarwal, she was issued an oral warning on January 25, 2012.  (Id., DSOF ¶ 23, Ex. B

at Macknet-6.)  That warning was issued pursuant to Defendant's Performance

Improvement/Disciplinary Policy ("Discipline Policy"), which provides that an oral warning is

the initial step in Defendant's progressive discipline framework.  (Id., DSOF ¶ 24.)  It was the

first in a series of disciplinary actions taken against Macknet throughout 2012, 2013, and 2014.

(Id., DSOF ¶¶ 25-31.)  During this time period, she also received poor annual performance

reviews.  (Id., DSOF ¶¶ 25, 28.)

On September 11, 2013, Macknet was issued a written warning, the next step after an oral

warning under the Discipline Policy, for entering incorrect prescription information into a

patient's chart and for violating the Health Insurance Portability and Accountability Act

("HIPAA") by leaving a patient's test results on the voicemail of another person.  (Id., DSOF ¶¶

31-33.)  On March 14, 2014, Defendant placed Macknet on probation, the final step prior to

termination pursuant to the Discipline Policy.  (Id., DSOF ¶ 34, Ex. B at Macknet-13.)  The

probationary letter warned that Macknet's "[f]ailure to consistently meet all of the performance

expectations for [her] position during or after this probationary period may result in the

immediate termination of [her] employment with [Defendant]."  (Id., Ex. B at Macknet-13

(emphasis added).)  That same language is contained within Defendant's Discipline Policy.  (Id.,

Ex. B at Macknet-4.)  Shortly after receiving the notice of probation, on April 15, 2014, Macknet

filed a Charge of Discrimination with the EEOC.  (Id., DSOF ¶ 39.)  The EEOC then issued a

Right to Sue Letter ("2014 Right to Sue") on September 10, 2014 stating that Macknet must

initiate any lawsuit arising from the facts alleged in her Charge within 90 days of her receipt of the letter.  (Id., DSOF ¶¶ 8, 12.)  Macknet does not know when she received the letter.  (Id., DSOF ¶ 9.)

Macknet's next work-related infraction occurred on November 25, 2014, when she sent confidential patient information to the wrong patient via email, thereby violating both HIPAA and Defendant's internal policies.  (Id., DSOF ¶ 41.)  A few days later, on December 1, 2014, that email was forwarded to Michelle Hackett, a Human Resources Administrator, due to the HIPAA violation.  (Id., DSOF ¶ 44.)  Ms. Hackett consulted with Amanda Smith, Macknet's direct supervisor, and Helen Sivieri, Macknet's second-level supervisor, and on December 10, 2014, Macknet's employment with Defendant was terminated.  (Id., DSOF ¶¶ 47, 49.)  The ultimate decision to terminate was reached by Ms. Sivieri following her discussion with Ms. Hackett and Ms. Smith.  (Id., DSOF ¶¶ 49, 52.)  At the time of Macknet's firing, neither Ms. Sivieri nor Ms. Smith knew that Macknet had filed an EEOC Charge in April 2014 or were aware of the existence of the 2014 Right to Sue.  (Id., DSOF ¶¶ 53-56.)  Ms. Hackett, in contrast, *was* aware that Macknet had filed the Charge, but neither knew about nor had seen the 2014 Right to Sue at the time of the decision to terminate.  (Id., DSOF ¶ 57.)

Macknet filed a second EEOC Charge of Discrimination on December 18, 2014 in which she alleged the retaliation claims that are the basis of this lawsuit.  (Id., DSOF ¶¶ 59-60.)

## II.     Procedural Background

On September 24, 2015, Macknet filed a complaint alleging retaliation in violation of the ADEA, ADA, and PHRA (ECF 1).  Defendant answered the Complaint on October 26, 2015 (ECF 4), and, after fact discovery and associated motion practice, filed for summary judgment on February 7, 2017 (ECF 31).  Macknet responded on March 21, 2017 (ECF 36), and Defendant

replied on March 28, 2017 (ECF 38).  On September 11, 2017, the Court held a telephone conference with counsel at which counsel was given the opportunity to respond to the Court's questions regarding various issues dispositive to this motion.  (ECF 42.)

## III.    Legal Standard

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, "by citing to particular parts of materials in the record" set out specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(c)(1)(A).  "Speculation and conclusory allegations do not satisfy [the non-moving party's] duty."  Ridgewood Bd. of Educ. V. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999) (superseded by statute on other grounds as recognized by P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. 2009)).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "that a genuine issue of material fact

exists and that a reasonable factfinder could rule in its favor." Id. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

**IV.    Analysis**

Macknet brings claims against Defendant under three statutes: the ADEA, the ADA, and the PHRA, each of which "contain nearly identical anti-retaliation provisions that prohibit discrimination against any individual because 'such individual' has engaged in protected activity." Fogelman v. Mercy Hosp., Inc., 283 F.3d 561, 564 (3d Cir. 2002). The Third Circuit has held that the statutes are to be interpreted identically, "except where there is something specifically different in its language requiring that it be treated differently." Id. at 567.

To establish a prima facie case of retaliation, Macknet must show that: (1) she engaged in a protected activity; (2) her employer took an adverse action either subsequent to or contemporaneous with her protected activity; and (3) a causal connection exists between the protected activity and the adverse action. Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007). Where, as here, a plaintiff lacks direct evidence of retaliation, the claim proceeds under the McDonnell Douglas burden-shifting framework which provides that once the plaintiff establishes her prima facie case, the burden shifts to the employer to provide a legitimate reason for its conduct. Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 257 (3d Cir. 2017). If the employer is able to do so, the burden then shifts back to the plaintiff "to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997)).

Here, it is undisputed that Macknet satisfies the first two prongs of the prima facie test—

her filing an EEOC Charge of Discrimination is a "protected activity," and her termination an "adverse action." Therefore, our analysis focuses on whether Macknet has adequately shown causation, both at the prima facie stage and at the pretext stage. See Carvalho-Grevious, 851 F.3d at 257 (stating that "[t]he onus is on the plaintiff to establish causation at two stages of the case: initially, to demonstrate a causal connection as part of the prima facie case, and at the final stage of the McDonnell Douglas framework to satisfy her ultimate burden of persuasion by proving pretext").

### A. Causal Connection Between EEOC Charge of Discrimination and Termination

The Third Circuit recently clarified the standard a plaintiff must meet to establish causation at the prima facie stage, holding that she "must produce evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse [employment] action.'" Carvalho-Grevious, 851 F.3d at 259 (quoting Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)) (emphasis omitted). There are three main avenues for establishing the requisite causal link: (1) temporal proximity between the protected activity and the adverse action; (2) a pattern of antagonism coupled with timing; or (3) where the trier of fact can infer causation from the record as a whole. Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

### i. Temporal Proximity

Almost eight months elapsed between Macknet's filing of her EEOC Charge and the termination of her employment with Defendant. (Def.'s Mot., DSOF ¶¶ 4-5 (Macknet filed her administrative complaint on April 15, 2014 and was terminated on December 10, 2014).) As Defendant notes, and Macknet tacitly admits, such a lengthy time period cannot support a finding of causation. See LeBoon v. Lancaster J.C.C. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) (holding

that "[a]lthough there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment"); Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003) (stating that "we have held that . . . an inference [of causation] could be drawn where two days passed between the protected activity and the alleged retaliation, but not where 19 months had elapsed") (internal citations omitted). Macknet cannot establish causation via temporal proximity.

### ii. Pattern of Antagonism

Similarly, she cannot show a causal connection by demonstrating that "other intervening retaliatory acts" occurred between the protected activity and the termination of her employment. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000). Indeed, Macknet does not argue that Defendant engaged in any antagonistic or retaliatory actions against her between the filing of her EEOC Charge in April 2014 and her termination in December 2014.

### iii. Record as a Whole

Rather, Macknet seeks to establish causation via "other evidence gleaned from the record as a whole," which she argues can lead the Court to infer causation. Id. at 281. Certain types of circumstantial evidence that have been found sufficient to show a causal connection include inconsistent reasons articulated for terminating the plaintiff's employment, other inconsistencies in the defendant's testimony, the defendant's conduct relating to other employees compared to its conduct relating to the plaintiff, and refusals to provide a reference for the plaintiff. See Wadell v. Small Tube Prods., Inc., 799 F.2d 69, 73 (3d Cir. 1986) (noting that the district court, in considering whether the plaintiff had shown the requisite causal link to support a prima facie case of retaliation, could have taken into account the employer's inconsistent explanations);

<u>E.E.O.C. v. L.B. Foster Co.</u>, 123 F.3d 746, 753-55 (3d Cir. 1997) (holding that the plaintiff had established a prima facie case of retaliation where the plaintiff showed that the employer routinely provided job references but refused to provide one for her, and where the employer's testimony regarding his knowledge of the plaintiff's intent to file a discrimination charge was inconsistent).

Here, Macknet argues that she has shown causation sufficient to make out a prima facie case of retaliation because: (1) Ms. Hackett knew of Macknet's protected activity and was involved in the decision to terminate her employment; (2) Macknet did not have sufficiently serious performance issues following her successful completion of probation to justify her firing; and (3) Dr. Giantonio gave Macknet positive reviews and stated he did not believe her HIPAA violation should have led to her termination. (ECF 36, Pl.'s Opp'n at 7-11.) Macknet also contends that she was fired one day after the date on which her 2014 Right to Sue expired, which timing could lead to the inference that Defendant intentionally fired her once she would be no longer able to sue them for it. (<u>Id.</u> at 10.)

Defendant counters that Macknet has failed to show that Ms. Hackett harbored any discriminatory animus against Macknet and that Ms. Hackett's mere knowledge of the EEOC Charge is insufficient to establish that she influenced Macknet's supervisors' decision to fire Macknet. (ECF 38, Def.'s Reply at 10-11.) Defendant further argues that even if Macknet could show discriminatory animus, she cannot establish proximate cause because there has been no showing that Defendant relied on Ms. Hackett's allegedly biased perspective in deciding to fire Macknet. (<u>Id.</u> at 11-13.) As for Macknet's argument regarding the suspicious timing of the termination, Defendant states that the 2014 Right to Sue did not in fact "expire" until December 12, 2014, two days after Macknet's firing, making Macknet's argument untenable as a matter of

law.  (Def.'s Mot. at 19-21.)  Defendant further states that no decisionmaker involved in Macknet's termination had any knowledge of the 2014 Right to Sue, meaning they could not have taken it into account in making the decision.  (Id. at 19.)

We will take in turn each of Macknet's bases for her argument that the record as a whole leads to an inference that her filing the EEOC Charge led to the termination of her employment.

### a.  Suspicious Timing

First, the timing issue.  The 2014 Right to Sue was mailed on September 10, 2014, and Macknet does not know when she received it.  (Id., DSOF ¶¶ 8-9.)  Defendant is correct that there is a rebuttable presumption that a plaintiff received notice of a right to sue three days after the EEOC mailed it.  Seitzinger v. Reading Hosp. & Med. Ctr., 165 F.3d 236, 239 (3d Cir. 1999) (concluding that what was formerly Federal Rule of Civil Procedure ("Rule") 6(e) but is now Rule 6(d), regarding computing the date on which a party must act when certain types of documents are served, mandates this result); DeFrancesco v. Weir Hazelton, Inc., 232 F.R.D. 454, 456-58 (E.D. Pa. 2005) (discussing the 2001 amendment to Rule 6(e) and holding that the amendment did not alter the Rule's applicability to EEOC Right to Sue letters, based on citations to several federal courts across the country and district courts in this Circuit); see, e.g. Vazquez v. Caesar's Paradise Stream Resort, 524 F. App'x 831, 833 (3d Cir. 2013) (reaffirming Seitzinger's holding that "in the absence of other evidence, courts will presume that a plaintiff received her right-to-sue letter three days after the EEOC mailed it").

Defendant is also correct that, based on that presumption and the fact that Macknet has put forth no evidence rebutting it, Macknet's 2014 Right to Sue did not expire until December 12, 2014, two days after she was fired.  But, where Defendant errs is in discounting what any of its personnel who saw the letter may have thought about its implications for Macknet's ability to

bring suit.  Even if legally Macknet's claim was alive until December 12, it is reasonable to infer that had one of Defendant's employees seen the 2014 Right to Sue, such employee could have believed it to give Macknet a window of ninety days from the date written on the letter.  Simply because a legal presumption in fact gave Macknet three more days in which to file her claim it does not necessarily follow that a lay person reading the letter would have known that.  Therefore, we must move on to consider the import, if any, of the timing noted by Macknet.

First, in order for the ninety day statement on the 2014 Right to Sue to have plausibly caused Defendant to terminate Macknet's employment one day after it appeared that she would lose her right to bring suit, then one of Defendant's employees involved in the decision to fire her had to have seen the letter.  It is undisputed that Mses. Sivieri, Smith, and Hackett were all involved in the discussions leading up to Macknet's termination.  (Def.'s Mot., DSOF ¶ 49.) Macknet admits that at the time the decision was made to fire her, neither Ms. Sivieri nor Ms. Smith had knowledge of the EEOC Charge of Discrimination or of the 2014 Right to Sue.  (Id., DSOF ¶¶ 53-56.)  The parties' disagreement centers on whether Ms. Hackett knew of the existence of the 2014 Right to Sue, although the parties agree that she knew of the existence of the Charge itself.  Macknet argues that it is inferable that Ms. Hackett became aware of the EEOC Charge by seeing the 2014 Right to Sue.  (Pl.'s Opp'n at 10.)  Defendant, on the other hand, cites to Ms. Hackett's deposition testimony in which she stated she was not aware that Macknet had received the letter.  (Def.'s Mot., Ex. D (Dep. Tr. of Hackett) at 27-28.)

The Court finds that Macknet's claim is belied by Ms. Hackett's clear testimony—in response to counsel's question "[w]ere you aware that Ms. Macknet had received [a Right to Sue letter] in her EEOC case in 2014," Ms. Hackett replied "[n]ot in 2014."  (Id., Ex. D at 28 (stating that she had seen Macknet's 2015 Right to Sue in her employee file).)  Although Macknet

disputed the averment in Defendant's statement of facts that "Ms. Hackett had no knowledge of the existence of the 2014 Right to Sue," she supported her denial of that statement merely by stating that "[Ms. Hackett] provides sufficient testimony to demonstrate the document should have been in her file." (Id., DSOF ¶ 57; ECF 37, Pl.'s Response to DSOF ¶ 57.) It is simply too tenuous of a hook to hang the causation requirement on to say that a reasonable juror could find that Ms. Hackett, who stated she was unaware of the 2014 Right to Sue during the relevant time period, did in fact see the letter solely because such letters are maintained in employee files to which Ms. Hackett has access. Further, as explained more fully below, there is no evidence showing that even if Ms. Hackett did see the Right to Sue, she harbored discriminatory animus towards Macknet or proximately caused Macknet's employment to be terminated.

Because we find no material dispute over whether Ms. Hackett knew of the existence of the 2014 Right to Sue, we conclude that no individual involved in the decisionmaking surrounding Macknet's termination could have been influenced by the letter's ninety day language. Therefore, Macknet's argument regarding the timing of her termination is not a ground for establishing the requisite causal link.

### b. Cat's Paw Liability

We turn to Macknet's second argument in support of causation: that Ms. Hackett recommended that Macknet's employment with Defendant be terminated in retaliation for Macknet's filing of her 2014 EEOC Charge. This contention is founded on what is known as the "cat's paw" theory of liability,[1] which provides a cause of action for an employee to hold his employer liable "for employment discrimination based on the discriminatory animus of an

---

[1] The term "cat's paw" derives from one of Aesop's fables in which a monkey convinces a cat to remove roasting chestnuts from an open fire, causing the cat to burn his paws and allowing the monkey to make off with the chestnuts and leave the cat with nothing. Staub v. Proctor Hosp., 562 U.S. 411, 415 n.1 (2011). Here, the cat is Defendant and the monkey, Ms. Hackett.

employee who influenced, but did not make, the ultimate employment decision." Staub v.

Proctor Hosp., 562 U.S. 411, 413 (2011); see Dolan v. Penn Millers Ins. Co., No. 09-2041, 2014

WL 2047897, at *11 (M.D. Pa. May 19, 2014) (explaining that this theory "imprints the

improper motive on the supervisor as a form of respondeat superior, regardless of the superior's

knowledge").  A successful cat's paw claim requires: "(1) a supervisor who is not the ultimate

decision [to] 'perform[] an act motivated by [discriminatory] animus that is intended . . . to cause

an adverse employment action,' and (2) 'that act [must be] a proximate cause of the ultimate

employment action.'"  Wray v. Sch. Dist. of Phila., No. 14-5886, 2016 WL 427058, at *3 (E.D.

Pa. Feb. 4, 2016) (quoting Staub, 562 U.S. at 422)).[2]  In adopting proximate cause as the second

prong, the Supreme Court rejected the "singular influence test" which held that an employer

would only be liable under a cat's paw theory if the nondecisionmaker employee "exerted such

'singular influence' over the decisionmaker as to make the decision no more than a rubber stamp

of the nondecisionmaker's recommendation." McKenna v. City of Phila., 649 F.3d 171, 177 (3d

Cir. 2011).[3]

Here, in support of her cat's paw theory, Macknet points solely to the fact that Ms.

Hackett was aware of the 2014 EEOC Charge and to Ms. Hackett's name appearing in the

Charge.  (Pl.'s Opp'n at 8.)  Defendant counters that Macknet has failed to show both that Ms.

Hackett's involvement in Macknet's termination was motivated by discriminatory intent and that

Ms. Hackett's actions proximately caused Macknet's termination.  (Def.'s Reply at 9-13.)  A

---

[2] We note that the Supreme Court's formulation of the requirements for cat's paw liability applies equally to co-workers exhibiting discriminatory animus as it does to supervisors exhibiting such animus.  See Burlington v. News Corp., 55 F. Supp. 3d 723, 737 (E.D. Pa. 2014) ("We doubt that the Supreme Court, having determined that both intent and proximate causation are required for cat's paw liability to attach based on a supervisor's discriminatory actions, would apply a less demanding standard when the biased employee is a coworker rather than a supervisor.")
[3] Staub also rendered Abramson v. William Paterson College of New Jersey, 260 F.3d 265 (3d Cir. 2001) and its explication of the causation requirement for imposing cat's paw liability no longer controlling, insofar as Abramson held that a plaintiff need only show that "those exhibiting discriminatory animus influenced or participated in the decision to terminate." Id. at 286.

thorough review of the record reveals that Defendant has the better of this argument—Macknet has failed to show that Ms. Hackett acted out of discriminatory animus or that her actions proximately caused Macknet's termination.

### i. Discriminatory Animus

We begin with the rule that an individual's mere knowledge of a plaintiff's involvement in protected activity is not sufficient to establish that the individual harbored discriminatory animus. See Hamilton v. SEPTA, No. 12-804, 2014 WL 2862146, at *15 n.31 (E.D. Pa. June 24, 2014) (noting that even were the court to find the individual who allegedly discriminated against the plaintiff to have been the cause of the plaintiff's termination, the plaintiff had failed to show causation because the claim of retaliation was "based solely upon [the individual's] knowledge of [the plaintiff's] protected activities"); Romero v. Allstate Ins. Co., 3 F. Supp. 3d 313, 328 (E.D. Pa. 2014) (stating that although "[a]n employee cannot establish retaliation without proving that the employer knew that the employee engaged in protected activity . . . [k]nowledge alone . . . is insufficient to prove retaliation") (emphasis omitted); Nesmith v. Independence Blue Cross, No. 02-2894, 2004 WL 253524, at *4 n.4 (E.D. Pa. Feb. 10, 2004) (agreeing with the defendant's argument that "mere knowledge of the protected activity does not, by itself, establish causation in a retaliation case").

In addition to supporting her claim that Ms. Hackett harbored discriminatory animus by reference to Ms. Hackett's knowledge of the EEOC Charge, Macknet cites the fact that Ms. Hackett's name appears in the Charge. We fail to see how this sways in favor of showing animus. In the EEOC Charge Macknet states that she "made numerous complaints to [Ms.] Hackett," was "filing this complaint for retaliation and for discrimination and [was] naming Helen [Sivieri]." (ECF 1, Cmplt., Ex. A at 4.) It is unclear why the appearance of Ms. Hackett's

name in the Charge as the individual to whom Macknet complained about workplace discrimination would compel Ms. Hackett to harbor discriminatory animus against Macknet. Our conclusion may be different had Macknet identified Ms. Hackett therein as the person who had discriminated against her, but that is specifically stated in the Charge as Ms. Sivieri.

In sum, Macknet has pointed to two pieces of evidence that she argues show Ms. Hackett's discriminatory animus—Ms. Hackett's knowledge of the 2014 EEOC Charge and the fact that her name appears in that Charge. Neither is capable of creating a genuine dispute as to Ms. Hackett's motive. In Mason v. SEPTA, 134 F. Supp. 3d 868 (E.D. Pa. 2015), the court denied summary judgment in a discrimination case where the plaintiff argued that another SEPTA employee had exhibited racial bias against him and had caused the plaintiff's termination. The court considered the "multiple encounters" that the plaintiff contended demonstrated this bias, including several discussions the plaintiff had with the individual which the court concluded "could be considered to embody cultural stereotypes derogatory towards African Americans." Id. at 870-71.

Whereas in Mason, the offending individual directed a racial epithet towards the plaintiff, "accompanied by ongoing comments that could be reflective of racial prejudice," here Macknet has put forth no evidence that Ms. Hackett harbored ill will towards her due to her filing of the EEOC Charge. Id. at 875. Rather, the record shows that Ms. Hackett, in her role as a Human Resources Administrator, only got involved in Macknet's employment with Defendant when Macknet began to have performance issues in January 2012. (Def.'s Mot., Ex. D at 11.) She then apparently became the "point person" for Macknet's case and, due to that, was kept informed as Macknet continued to have work-related problems, specifically the two HIPAA violations. (Id. at 11, 13.) At some point in the midst of this time period, Ms. Hackett became

aware of the EEOC Charge, and eventually she recommended that Macknet be terminated. These facts simply reflect no connection between Ms. Hackett's awareness of the EEOC Charge and her involvement in the decisionmaking surrounding Macknet's termination.

## ii. Proximate Cause

Assuming *arguendo* that Macknet had put forth evidence to show that Ms. Hackett acted out of discriminatory animus when she recommended terminating Macknet's employment, Macknet has failed to show proximate cause. As noted above, the cat's paw theory requires that the non-decisionmaker's discriminatory conduct be the proximate cause of the ultimate employment action. Staub, 562 U.S. at 422. Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged;" it is "causation substantial enough and close enough to the harm to be recognized by law." Hemi Grp., LLC v. City of New York, N.Y., 559 U.S. 1, 9 (2010); Sosa v. Alvarez-Machain, 542 U.S. 692, 704 (2004).

In the cat's paw context, the Third Circuit has noted that "proximate cause will not exist when the employer does not rely on the supervisor's biased report in taking the ultimate adverse action." Jones v. SEPTA, 796 F.3d 323, 331 (3d Cir. 2015) (internal quotations omitted). In Jones, the court rejected the plaintiff's claim for cat's paw liability, holding that although the allegedly discriminatory report may have been the but-for cause of the plaintiff's termination insofar as it got "the ball rolling" on the investigation of the plaintiff, it was not the proximate cause because the ultimate termination decision was the result of an independent investigation. Id. Similarly here, even if Ms. Hackett's recommendation that Ms. Sivieri fire Macknet was motivated by discriminatory animus, it is clear that such action was not the proximate cause of the termination. Rather, both of the other two individuals involved in the decisionmaking regarding Macknet's termination—Ms. Smith and Ms. Sivieri—testified that the decision was

reached due to Macknet's long history of performance issues and her most recent, serious,

HIPAA violation.  (See Def.'s Mot., Ex. F (Dep. Tr. of Smith) at 10-11 (stating that the HIPAA

violation "was the last in a very long line of mistakes" that Macknet had committed); id., Ex. E

(Dep. Tr. of Sivieri) at 9 (testifying that when Ms. Hackett asked her how she wanted to handle

the situation she responded that "there have been a long list of infractions for [Macknet] all in

her file and that this [HIPAA violation] was just kind of the last").)

        This case stands in contrast to a case like McKenna, in which the record revealed no

reasons for terminating the plaintiff apart from the discriminatory actions of the plaintiff's

supervisor.  McKenna, 649 F.3d at 179 (reasoning that although there was an intervening

independent report, "a reasonable jury could conclude that [the supervisor's] animus bore a

direct and substantial relation to [the plaintiff's] termination and that [the report's]

recommendation was not independent and was foreseeable").  Here, the decisionmakers cited

several non-retaliatory reasons for firing Macknet—namely, her significant history of poor work

performance and her two HIPAA violations.  Ms. Hackett's agreement with the conclusion of

Ms. Sivieri and Ms. Smith, the ultimate decisionmakers, that termination was necessary cannot

be described as the proximate cause of the event.  Indeed, just as in Jones, "undisputed evidence

excludes the possibility that [Defendant] merely 'adopted [Ms. Hackett's] biased account of the

events.'"  Jones, 796 F.3d at 331 (quoting McKenna, 649 F.3d at 179); see also Wray, 2016 WL

427058 at *4 (rejecting cat's paw liability where the defendant had not "rubberstamp[ed]" the

discriminatory employee's "account of the facts" but rather had "deci[ded] to terminate [the

plaintiff] . . . based on many types of evidence, such as surveillance footage, that were

independent from [the employee's] sphere of influence").

        For these reasons, Macknet can neither demonstrate that Ms. Hackett harbored

discriminatory animus nor that she proximately caused Macknet to be fired.

### c. Remaining Evidence

The only two other pieces of evidence that Macknet points to in support of the causal connection element of her prima facie case are that she had minimal performance issues following her successful completion of probation and that Dr. Giantonio gave Macknet positive reviews and stated he did not believe her HIPAA violation should have led to her termination. (Pl.'s Opp'n at 7-11.)  The Court is unable to infer a causal connection from these facts considered in light of the rest of the evidentiary record.

First, as Defendant points out, the March 14, 2014 letter sent to Macknet stating she was being placed on probation specifically provided that her "[f]ailure to consistently meet all of the performance expectations for [her] position <u>during or after</u> this probationary period may result in the immediate termination of [her] employment with [Defendant]."  (Def.'s Mot., Ex. B at Macknet-13 (emphasis added).)  In addition, Defendant's Discipline Policy contains the same disclaimer: "[i]f during, at the conclusion of, <u>or subsequent to</u> the probationary period, the staff member's performance or conduct is still unacceptable, the supervisor . . . will determine if termination is appropriate."  (<u>Id.</u>, Ex. B at Macknet-4 (emphasis added).)  This language clearly conveyed to Macknet that any further work-related performance issues or deficiencies, following her probationary period, could result in her termination.  When she then undisputedly committed a serious HIPAA violation on November 25, 2014 by sending confidential patient information to the wrong person, Defendant adhered to its policies, which had been well-communicated to Macknet, and terminated her employment.  We are unconvinced by Macknet's argument that a retaliatory motive can be inferred by Defendant's decision to terminate her due to the November 2014 HIPAA violation.  Rather, as the termination letter makes clear, Defendant considered

Macknet's long history of poor performance at work, the fact that she had been on probation for such performance, and the HIPAA violation in deciding to fire her. These were legitimate considerations and none bespeak a retaliatory motive.

Second, Dr. Giantonio's positive review of Macknet is not sufficient to create a genuine dispute of fact regarding the existence of a causal connection between the EEOC Charge and Macknet's termination. As detailed above, Defendant based its termination decision on several documented, legitimate factors, most notably Macknet's post-probation HIPAA violation. The fact that one of the doctors for whom Macknet worked gave her a positive review and opined that her HIPAA violation "didn't rise to the level of . . . losing one's job," does not create an inference that Defendant harbored retaliatory motives. (Pl.'s Opp'n, Ex. E (Dep. Tr. of Dr. Giantonio) at 10.) In addition, Macknet fails to discuss other portions of Dr. Giantonio's deposition in which he stated that he "acquiesced" in Macknet's termination because "[t]he complaints had been building on performance for a while at that point [of the second HIPAA violation] . . . [and], in the context of the other performance issues, [he] thought [it] was what they needed." (Id., Ex. E at 16.)

Because Macknet has failed to establish a prima facie case of retaliation, her claim necessarily fails and summary judgment is warranted. However, we will continue in the analysis for the sake of completeness.

### B. Legitimate Justification for Macknet's Termination

Where a plaintiff in a retaliation action has established a prima facie case, the burden then shifts to the defendant employer to proffer a legitimate, non-retaliatory reason for terminating the plaintiff's employment. Carvalho-Grevious, 851 F.3d at 257. The defendant's burden at this stage is "'relatively light: it is satisfied if the defendant articulates any legitimate reason for the

[adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action].'" Krouse, 126 F.3d at 500-01 (quoting Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997)).  Here, in Macknet's termination letter Defendant cited Macknet's need to be "counseled and disciplined repeatedly regarding [her] job performance," including her probationary period and subsequent HIPAA violation.  (Def.'s Mot., Ex. B at Macknet-18.)  These are sufficient to satisfy Defendant's burden to show a legitimate reason for terminating Macknet's employment.

### C.  Pretext

Once the employer satisfies the low burden of showing a legitimate justification for the adverse employment action, the plaintiff must then demonstrate that the proffered explanation was false and that the true motivation for the action was retaliation.  Krouse, 126 F.3d at 501. Plaintiffs accomplish this by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'"  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (emphasis omitted) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).  Here, Macknet relies on the same evidence in support of her pretext argument as she did in support of her contention that she satisfied the causation requirement at the prima facie stage.  Specifically, that: (1) Ms. Hackett knew of Macknet's protected activity and was involved in the decision to terminate her employment; (2) Macknet did not have sufficiently serious performance issues following her successful completion of probation to justify her termination; and (3) Dr. Giantonio gave Macknet positive reviews and stated he did not believe her HIPAA violation should have led to her termination.  (Pl.'s Opp'n at

7-11.)  Macknet also contends that she was fired one day after the date on which her 2014 Right to Sue expired, which timing could lead to the inference that Defendant intentionally fired her once she would be no longer able to sue them for it.  (Id. at 10.)

The Third Circuit recently held that a plaintiff's causal burden is lower at the prima facie stage of a retaliation case than it is at the pretext stage.  Carvalho-Grevious, 851 F.3d at 258-59 ("Consistent with our precedent, a plaintiff alleging retaliation has a lesser causal burden at the prima facie stage.").  Here, we carefully examined each basis Macknet proffered in support of showing causation for her prima facie case and concluded that she had failed to do so.  Therefore, it follows that the same evidence cannot establish that the reasons Defendant put forth for firing Macknet were merely a pretext for retaliation.  To reiterate, the record shows that Macknet's employment was terminated because of ongoing deficiencies in her work performance over several years, including two HIPAA violations, one of which occurred after she underwent a probationary period and was warned that further infractions were likely to result in her termination.  The evidence does not support any of Macknet's arguments that we can infer that Defendant's decision to terminate her employment was related in any way to her filing the 2014 EEOC Charge.  Therefore, even assuming that Macknet established a prima facie case, she cannot show the requisite pretext.

The Court adds, with reference to the recorded conference on September 11, 2017, which was held by telephone because counsel was not available for in court oral argument on a timely basis, that Macknet did not point to any evidence supporting her claims about Ms. Hackett, causation, or pretext not discussed above, all of which the Court has found as a matter of law insufficient to allow this case to proceed to trial.

## V.    Conclusion

For the reasons detailed above, Defendant's Motion for Summary Judgment is granted.

O:\CIVIL 15\15-5321 Macknet v U of PA\15cv5321 memo re sj.docx